UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| LARRY BRODANEX, <br><br> Plaintiff, <br><br> v. <br><br> TOWN OF ST. JOHN, <br><br> Defendant. | CAUSE NO.: 2:17-CV-395-TLS |

**OPINION AND ORDER**

Plaintiff Larry Brodanex filed a one-count Complaint [ECF No. 5] against Defendant Town of St. John on October 6, 2017. The Plaintiff brings a claim under 42 U.S.C. § 1983, alleging a violation of his Fourth Amendment rights when 30 dogs and other items were seized from his dog training business pursuant to two search warrants. Following the close of discovery, the Defendant filed the instant Motion for Summary Judgment [ECF No. 77], which is fully briefed and ripe for ruling. Because the September 13 and 19, 2017 search warrants were supported by probable cause, the Court grants the Defendant's motion for summary judgment.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every

element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**MATERIAL FACTS**

**A.     Investigation of the Plaintiff's Business by the Town of St. John**

In August and September 2017, the Plaintiff operated a dog training business, "The Trauma Training Experience," at 9620 Industrial Drive in St. John, Indiana. Ex. A at 5, ECF No. 78-2. On August 23, 2017, St. John Animal Control received a complaint about the Plaintiff's business. Ex. E at 107, ECF No. 78-7; Ex. F at 54, ECF No. 78-8. The complainant advised that the dogs were being shot at with blank guns, were being beaten with a training whip, and were being trained outdoors without fencing. Ex. E at 137; Ex. F at 48–49.[1] St. John Animal Control Officer Jan Kalinowski visited the business on August 24, 2017, but was unable to make contact with the Plaintiff. Ex. F at 50–51. When she arrived, she could smell a strong odor of urine

---

[1] The parties' dispute over whether the complainant asked to remain anonymous at the time of the call is not relevant to the Court's analysis.

emanating from the property. *Id*. at 52. She did not find any evidence of dog fighting on the property outside the facility. *Id*. at 51–52.

On August 25, 2017, ACO Kalinowski returned to the Plaintiff's business, and the Plaintiff voluntarily allowed her to enter the premises. Ex. A at 5; Ex. F at 55, 58; Ex. I at 11–13, ECF No. 78-11. The Plaintiff was setting up his kennel at the time and only had a few dogs. Ex. I at 12. The Plaintiff did not have a business license or rabies vaccination records for the dogs, which ACO Kalinowski told him were required by law. Ex. A at 5; Ex. I at 13. ACO Kalinowski observed a lot of feces and urine in the facility, which she asked the Plaintiff to clean up. Ex. F at 59. She observed one dog with wounds on its legs and that some of the dogs were in very small wire crates with no bottoms so that the dogs were standing on the wire flooring, which can cause deformities to their feet. *Id.* at 82–85. ACO Kalinowski was concerned that the dogs were not being properly cared for, although she did not feel there was an urgency to remove the dogs at that time. *Id.* at 59–60.

At ACO Kalinowski's request, Lake County Sheriff's Department Detective Michelle Dvorscak then visited the Plaintiff's business and, with the Plaintiff's permission, looked around inside. Ex. G at 12–13, ECF No. 78-9; Ex. F at 60–61. Detective Dvorscak observed a slat mill, which is equipment that may be used in connection with dog fighting. Ex. G at 13–14.[2] She did not observe any obvious health problems with the six or seven dogs present, and she saw no evidence of dog fighting. *Id.* at 15, 17. However, she was concerned by a number of empty kennels with fresh shavings, which she would not expect to see in an unused kennel. *Id.* at 18–

---

[2] Detective Dvorscak described a "slat mill" as follows: "[N]ormally a treadmill at the gym has rubber on it. These are little slats of wood and there's no motor. It's powered by the dog gripping onto the slats and making it go." Def. Ex. G at 14.

19. She thought this suggested that the Plaintiff may have taken some dogs out and was expecting to bring them back. *Id.* at 19–20.

On September 11, 2017, ACO Kalinowski visited the Plaintiff's business again. Ex A at 5; *see* Ex. I at 25, 34. She knocked on the front and back doors, but no one answered. Ex. A at 5. She observed a strong smell of urine and feces. Ex. F at 86. At some point, the building owner, Gary Rassell, arrived. Ex. A at 5.[3] Rassell also observed an obvious odor of dog feces from outside the building. Ex. F at 15–16. Rassell opened the building. Ex. A at 5. ACO Kalinowski observed some dogs that were too big for their crates and observed that it was very warm inside the building. Ex. F at 89–90. She called additional St. John officers to the scene, and Officer Stamate, Officer Widen, and Corporal Gardenhire responded. Ex. A at 4, 6; Ex. F at 102. From the parking lot, Officer Widen smelled a distinct odor of urine and feces. Ex. F at 103. At some point, the Plaintiff arrived on-scene. Ex. A at 4. St. John officers had already entered the building when he arrived. Ex. I at 35. When questioned by ACO Kalinowski, the Plaintiff stated that he had not yet obtained his business license. Ex. A at 6. When ACO Kalinowski asked the Plaintiff why the dogs were so thin, the Plaintiff responded that he had just gotten some of the dogs the day before from a friend who went to jail. *Id.* at 7.

ACO Kalinowski observed the conditions inside the Plaintiff's business on September 11, 2017. *Id.* at 5–6. There were 37 dogs inside the facility, most of which were sickly and emaciated. *Id.* at 7. They had a skeletal appearance, with their ribs, hip bones, and spinal cords clearly visible. *Id.* Five young dogs were sitting in very small crates with feces and urine. *Id.* at 6; Ex. F at 68; *see also* Ex. I-3 at 3, ECF No. 78-14; Ex. K at 6–7, ECF No. 78-17. Two young

---

[3] The parties' dispute about the circumstances leading to Rassell opening the building on September 11, 2017, is immaterial to the Court's determination of whether the searches on September 13 and 20, 2017, were lawful based on the September 13 and 19, 2017 search warrants.

4

puppies were in cages with no bottoms and a great amount of feces and urine. Ex. A at 6; Ex. F at 68; Ex. K at 6. ACO Kalinowski observed the dogs to be horribly emaciated and filthy and observed sores on the dogs. Ex. A at 6; *see generally* Ex. K. Some of the dogs had leg injuries. Ex. A at 7; Ex. K at 1, 3–4, 12–15.

      The Plaintiff explained that the dogs that were emaciated and had wounds were dogs that he had just obtained from his friend. Ex. I at 29–32. Rassell also observed that those dogs "were in somewhat bad shape." Ex. F at 37. There was a large amount of feces and urine on the floor— "a typhoon of poop," in the Plaintiff's words. Ex. I at 26. The Plaintiff agrees that the conditions in the building on September 11 were "really messed up." *Id.* at 44 ("I know somebody else seeing it, they were saying, 'Oh, my God.'"). Officer Stamate, who photographed the dogs at the scene, observed feces and urine in and around several of the dog cages, a strong odor of urine, that several of the dogs were in poor health and appeared emaciated, and that several of the dogs had scars. Ex. A at 4.[4] The photographs taken by Officer Stamate accurately show the Plaintiff's business on that date. Ex. I at 145; Ex. I-3. Officer Widen also observed a large amount of urine and feces on the floor on September 11, 2017. Ex. F at 104.

      The Plaintiff asked ACO Kalinowski to take possession of some of the dogs, and she took possession of five dogs in poor health. Ex. A at 4, 7; Ex. I at 32–33. ACO Kalinowski was concerned for the health of the other dogs, but she could only take five dogs at that time because of limited space at St. John Animal Control. Ex. F at 75–76. She photographed some of the dogs she took from the facility. Ex. F at 70. The Plaintiff helped transport some of the dogs that he had given to ACO Kalinowski to St. John Animal Control. Ex. A at 8; Ex. I at 33.

---

[4] The parties' dispute as to whether the Plaintiff gave Officer Stamate permission to enter the facility to take pictures on September 11, 2017, is immaterial to the Court's determination of whether the searches on September 13 and 20, 2017, were lawful based on the September 13 and 19, 2017 search warrants.

5

One of the puppies that was taken had green mucus in both eyes, one of its eyes was stuck shut, it was emaciated and had stomach bloat, it was covered in feces and urine, and its paw pads were red and irritated. Ex. A at 6; Ex. F at 68; Ex. K at 7. Its paw pads were deformed, which ACO Kalinowski believed was due to being housed in a cage without a bottom tray for long periods of time. Ex. A at 6. Another puppy had been sitting in a wire cage without a bottom tray, with a lot of feces and urine; the dog was emaciated and had bloating. *Id.* ACO Kalinowski took the two puppies to a veterinarian that night. *Id.* at 8. The puppies were found to be in need of subcutaneous fluids, antibiotics, de-worming, and vaccination, and one of the puppies was quarantined for possible distemper. *Id.* The three other dogs were emaciated, dehydrated, and had bite wounds and scars on their feet and legs. *Id.*

ACO Kalinowski advised the Plaintiff that two of the dogs remaining at the facility were in horrible condition and needed to see a veterinarian that night due to leg injuries; the Plaintiff describes it as a broken toenail, and he did not think that the issue was serious enough to see a veterinarian. *Id.* at 7–8; Ex. I at 41, 45–46; Ex. F at 75; *see also* Ex. I-3 at 15; Ex. K at 14–15. On September 11, 2017, the Plaintiff still did not have a business license or proof that any of the dogs had been vaccinated for rabies. Ex. F at 85–86.

The next day, the Plaintiff returned to St. John Animal Control to pick up his crate. *Id.* at 8; Ex. I at 33, 43–44. At the Plaintiff's request, ACO Kalinowski returned to the facility to see the work that he had done; she observed that the cages were cleaner, but the dogs were still unhealthy, the dogs were still not vaccinated, and the Plaintiff had not taken two of the dogs to the vet to have their leg injuries examined. Ex. A at 8-9; Ex. I at 44. *see also* Ex. K at 14–15.

B.     The September 13, 2017 Search Warrant and Search

On September 12, 2017, St. John Detective Ronald Olson, the lead detective on this investigation, met with ACO Kalinowski, Officer Stamate, Detective Steve Flores,[5] and Lake County Detective Dvorscak. Ex. A at 10; Ex. J at 10–12, ECF No. 78-16. ACO Kalinowski advised him of the course of her investigation into the Plaintiff's business, and Detective Olson considered her to be credible. Ex. A at 10–13; Ex. G at 48–49. As a detective, Detective Olson relies on information by other law enforcement officers and generally considers the information that he receives from other law enforcement officers to be reliable. Ex. J at 73.

On September 13, 2017, Detective Olson read the reports, viewed the photographs taken on September 11, and observed some of the dogs that had been taken on September 11. *Id.* at 12, 20–21; Ex. A at 13; Ex. G at 49–50. He spoke with Indiana Department of Animal Health District 1 Field Veterinarian Dr. Jennifer Strasser, who had viewed some of the photos via text message; she advised that the wounds looked consistent with dog fighting and that the dogs' health appeared deplorable. Ex. G at 50; *see also* Ex. A at 15.

Based upon the information obtained from ACO Kalinowski, Officer Stamate, Lake County Detective Dvorscak, and Dr. Strasser, Detective Olson requested a warrant based upon probable cause for animal neglect and possible animal fighting. Ex. A at 13; Ex. J at 28–29; Ex. I-1, ECF No. 78-12. The Plaintiff does not contest most of the facts presented in the affidavit of probable cause, but he believes that Detective Olson misinterpreted what he saw as evidence of dog fighting. Ex. I at 117–30. Detective Olson received the search warrant, electronically signed by Lake County Magistrate Catheron Paras, at about 2:21 p.m. on September 13, 2017. Ex. A at 13; Ex. B, ECF No. 78-3.

---

[5] Detective Flores was subsequently appointed Chief of the St. John Police Department.

That same day, Detective Olson and other officers executed the search warrant. Ex. A at 13–14; Ex. I at 55. Even before the building was opened, Detective Olson smelled a strong odor of urine and feces. Ex. A at 13; Ex. G at 51. Inside, he observed an overbearing smell of ammonia from urine, multiple leather whips, studded collars, dog bite sleeves, a dog treadmill, many cages without food and water, and dogs with open wounds. Ex. A at 14; Ex. G at 53–54. Detective Dvorscak observed fresh and old scarring on the dogs she believed to be indicative of dog fighting, that the facility was filthy, and that most of the dogs in the facility had physical ailments or obvious health issues. Ex. G at 23–27. Photographs taken during the search accurately depict the Plaintiff's business on that date. Ex. I at 147; Ex. I-4, ECF No. 78-15. During the search, the nine dogs in the worst condition were seized, along with other personal property. Ex. A at 14–15. Many of the dogs were so skinny that their hip bones, ribs, spine, and other internal features were clearly visible. *Id.* at 15.

During the search, the Plaintiff advised that all but two of the nine dogs seized belonged to him. *Id.* at 15. One of the dogs was emaciated and had two large wounds on its leg; the Plaintiff advised that the dog belonged to him and that he was treating the wounds. *Id.* at 15; *see also* Ex. K at 14–15. The Plaintiff advised that he administers the dogs' vaccinations himself by purchasing horse vaccines and lowering the doses; the only vaccination that he could not administer was rabies, and his dogs were not vaccinated for rabies. Ex. A at 15. The Plaintiff advised that he feeds his dogs a raw diet; if they do not eat when the food is set out, then they do not eat. *Id.* at 15.

**C.      The September 19, 2017 Search Warrant and September 20, 2017 Search**

On September 15, 2017, Detective Olson met with Dr. Strasser. *Id.* at 15; Ex. G at 54–55. Dr. Strasser examined the five dogs seized on September 11, 2017, and the nine dogs seized on

8

September 13, 2017. Ex. A at 15; Ex. G at 54–55. On September 18, 2017, Detective Olson received an email from Dr. Strasser with a short summary of her examination. Ex. A at 15–16. Dr. Strasser advised:

> A Body condition scoring system developed by Nestle Purina was used to evaluate the condition of the dogs. This system uses a range from 1.0 for emaciated dogs to 9.0 for extremely obese dogs. Normal body condition (BCS) using this system is considered to be in the 4.0 to 5.0 range.
>
> Twelve of the 14 dogs (86%) are considered significantly malnourished (BCS 3.5 or lower) and eight of these are at such a level of severe malnutrition that they have utilized all or nearly all of their body fat and have begun breaking down their own muscle tissue in an effort to provide enough energy to stay alive. Keep in mind also that this assessment was done after the dogs had been in custody for at least a couple of days, receiving proper care. Many of these dogs had been in imminent danger of starving to death.
>
> Nearly all of the dogs showed evidence that they had been living in filthy conditions for an extended period of time due to staining of their bellies, paws and/or hindquarters and varying degrees of dermatitis and hair loss. Many of these dogs had already received baths, and the staining as well as smell of dog urine and feces was still very evident. Additionally, 10 of the dogs exhibit a variety of sores, and most of these dogs have many sores, not just one. Some of these sores appear to be aggravated puncture wounds and others appear to be pressure sores or urine scalding.
>
> The adult dogs and even some of the younger dogs showed varying degrees of dental disease. Many of the dogs still have excessively long toenails, though many had had their nails trimmed while in custody, prior to my exam, to prevent further discomfort and damage.
>
> In addition to the above points, several of the dogs had old sutures still hanging from their cropped ears, though the ears were healed and the sutures should have already been removed. Those had the potential to get caught and then rip the ear. Others of the dogs had evidence of inflammation and waxy buildup in their ears indicative of otitis externa, or ear infections. One dog in particular also exhibited labored breathing of undetermined origin, which could be a sign of a life-threatening condition.
>
> Reportedly, none of the dogs had been vaccinated for rabies.
>
> The health and well-being of these dogs were at extreme risk in the environment from which they were removed, and the health and well-being of any dogs remaining in that environment could be in imminent danger.

Ex. A at 16–17; *see also* Ex. E at 22–23, 26–27. Dr. Strasser advised Detective Olson to remove the remaining animals. Ex. E at 22–23, 26–27.

After receiving the email from Dr. Strasser, Detective Olson requested a second warrant on September 18, 2017, again based upon probable cause for animal neglect and possible animal fighting. Ex. A at 17; Ex. I-2, ECF No. 78-13. The Plaintiff does not contest most of the facts presented in the probable cause affidavit but believes that there was a rush to judgment because people wrongly believed that he was involved in dog fighting. Ex. I at 129–44. On September 19, 2017, Detective Olson received the warrant signed by Lake County Judge Bruce Parent. Ex. A at 17; Ex. C, ECF No. 78-4. Detective Olson and other officers executed the second search warrant on September 20, 2017. Ex. A at 17; Ex. I at 64. While standing outside the building, Detective Olson could immediately smell the odor of urine and feces, even without any open doors or windows. Ex. A at 17.

The Plaintiff was not present when the officers arrived at the facility; he arrived just before Rassell arrived to open the building. *Id.* at 17–18. When entering the building, Detective Olson observed an overwhelming odor of urine and feces. *Id.* at 18. The conditions inside the facility were similar to the conditions on September 13, 2017. Ex. G at 56. He observed multiple piles of feces in many of the cages and many cages with cloudy water that appeared to not have been changed for an extended period of time. Ex. A at 18. There were 22 dogs inside the facility, many of which had bloodshot eyes, sores on their limbs, and fur stained by urine and/or feces. *Id.* The weather that day was hot, with a high of 90 degrees, but there was no ventilation inside the facility. *Id.* All 22 dogs at the facility were seized. *Id.* at 18–19.

D.     **Events Following the September 20, 2017 Search—the Criminal Charges; the Motion to Suppress; and Dismissal of the Criminal Charges**

On October 5, 2017, after examining all the dogs seized from the Plaintiff's business, Dr. Strasser issued her report. Ex. E at 21–24; Ex. D, ECF Nos. 78-5, 78-6. Dr. Strasser wrote:

> Nearly every dog under the care of Mr. Larry Brodanex was in need of some form of veterinary care at the time of this assessment, many of them showing signs of trauma or active skin infections. Additionally, many showed signs of inadequate nutrition, with sixteen (16) of the dogs considered to be below the normal body condition score of 4.0 to 5.0 for a dog. It appeared that some of these dogs had not received adequate veterinary care for an extended period of time, as many of the conditions were chronic, and some conditions could easily become life-threatening.
>
> Sanitation of the dog enclosures was poor and the dogs were living in their own waste and breathing ammonia fumes, as evidenced by the condition of the dogs themselves. This likely was a major factor in the high percentage of skin and external parasite problems with a definite negative impact on the health and well-being of these animals. Initial pictures of the facility confirm that absorbent bedding was not being used, although it is present in later pictures after visits by the officers.
>
> Injuries sustained by the dogs and sutures left in place longer than necessary are breaches of one of the body's most important mechanisms of protection against disease – the skin. Injuries to the skin allow bacteria to penetrate that protective barrier. Injuries to underlying tissue such as muscles and connective tissues can affect the function of those important structures. Injuries to arteries or veins will lead to bleeding which could potentially be substantial enough to cause weakness or death, if unchecked.
>
> Over 40% of these dogs were in thinner than normal body condition. Chronic malnutrition leads to the animal utilizing its own energy reserve—fat—to provide enough energy to stay alive. Another contributing factor to the poor health status of many of these animals was likely a weakened immune system subsequent to inadequate nutrition. These animals were not receiving adequate nutrition to meet their needs, putting their health and well-being in jeopardy without immediate improvement.

Ex. D at 56, ECF No. 78-6.

Based upon the information learned during the investigation, Detective Olson sought criminal charges against the Plaintiff. Ex. G at 56; *see also State of Indiana v. Larry Earl*

11

*Brodanex*, 45G01-1710-F6-239.[6] The Plaintiff was charged with nine counts of felony torturing or mutilating a vertebrate animal and 34 counts of misdemeanor animal cruelty. *See State of Indiana v. Larry Earl Brodanex*, 45G01-1710-F6-239. In the criminal proceedings, the Plaintiff filed a motion to suppress the evidence obtained through the September 13 and 19, 2017 search warrants. *See* Ex. H, ECF No. 78-10. Following an evidentiary hearing, the state criminal court granted the motion to suppress. *Id.* The court found that the landlord's consent to enter the building on September 11, 2017, was insufficient absent exigent circumstances, that the State had not shown exigency, and that, therefore, the evidence obtained pursuant to the search warrants was inadmissible as fruit of the poisonous tree. *Id.* The parties agreed that the search warrants were obtained based on the observations of the officers during the illegal September 11, 2017 entry; the search warrants were not entered into evidence before the state court. *Id.* On May 16, 2019, the state court granted the State of Indiana's motion to dismiss all charges against the Plaintiff. *See State of Indiana v. Larry Earl Brodanex*, 45G01-1710-F6-239.

## ANALYSIS

Section 1983 provides, in pertinent part, that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must show that the defendant deprived him of a federal constitutional right and that the defendant acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). In this case, the Plaintiff alleges that the Defendant deprived him of his Fourth Amendment right to be free from unreasonable searches and seizures when Town of St. John police officers executed

---

[6] The Court takes judicial notice of this public record.

12

a pair of search warrants on September 13 and 20, 2017, seizing a number of dogs and other property. Seeking summary judgment in its favor, the Defendant argues that there was no constitutional violation because the searches were conducted pursuant to facially valid search warrants that were supported by probable cause as determined by a judicial officer.

"Searches undertaken pursuant to valid search warrants are presumptively valid." *Archer v. Chisholm*, 870 F.3d 603, 613–14 (7th Cir. 2017) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "In order to be valid, a search warrant must: (1) be issued by a neutral and disinterested magistrate; (2) establish probable cause that the evidence sought in the warrant will aid in obtaining a conviction of a particular offense; and (3) describe with particularity the things to be seized and the place to be searched." *Id.* at 614 (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)). However, "[a] warrant is insufficient for Fourth Amendment purposes if the requesting officer 'knowingly, intentionally, or with reckless disregard for the truth, makes false statements' when requesting it, and her false statements were 'necessary to the determination that a warrant should issue.'" *Id.* at 615 (quoting *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012)). "This includes an officer's failure to disclose facts that she 'knew would negate probable cause.'" *Id.* (quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003)).

Here, the Plaintiff does not contest that the warrants were issued by neutral and disinterested judges or that the warrants described with particularity the place to be searched and the things to be seized. *See* Exs. B, C. Nor does the Plaintiff argue that the officers made any false statements in the warrant applications or failed to disclose facts they knew would negate probable cause. Rather, the Plaintiff argues that the search warrants are not facially valid because the state criminal court granted his motion to suppress the evidence seized during those searches as fruit of the poisonous tree. The Plaintiff also argues that the Defendant is collaterally estopped

from asserting the validity of the warrants based on the state court's ruling on the motion to suppress. The Court considers each argument in turn.

1.  *Probable Cause*

The Plaintiff argues that the September 13 and 19, 2017 search warrants cannot be facially valid because the state court in the underlying criminal prosecution granted his motion to suppress the evidence seized from the execution of the search warrants. Indeed, the state court found that the evidence seized pursuant to the search warrants was fruit of the poisonous tree. The state court found that the September 11, 2017 warrantless entry into the Plaintiff's business violated the Fourth Amendment because the Plaintiff did not give consent for the police to enter, there was no evidence that the landlord had reserved the right to allow the police to enter absent exigent circumstances, and there was no showing of exigent circumstances. Although the search warrants were not entered into evidence, the parties agreed that the warrants were obtained based on the observations of the police during the illegal September 11, 2017 entry. Thus, the state court granted the motion to suppress and excluded the evidence.

However, the Seventh Circuit has held that "the exclusionary rule does not apply in a civil suit under § 1983 against police officers." *Martin v. Marinez*, 934 F.3d 594, 599 (7th Cir. 2019) (citing *Vaughn v. Chapman*, 662 F. App'x 464, 465 (7th Cir. 2016); *Lingo v. City of Salem*, 832 F.3d 953, 958–59 (9th Cir. 2016); *Black v. Wigington*, 811 F.3d 1259, 1267–68 (11th Cir. 2016); *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997)); *see also Ferrell v. Bieker*, No. 1:03-CV-27, 2006 WL 287173, at *7 (N.D. Ind. Feb. 3, 2006) (analyzing the case law prior to *Vaughn* and *Martin* to find that, in a § 1983 case, the determination of probable cause can be based on evidence that was later excluded in a criminal case because of a constitutional violation). Based on this principle, the

court in *Martin* found that "the fact that the evidence was the fruit of an illegal detention does not make it any less relevant to establishing probable cause for the arrest." *Id.* The Plaintiff fails to address this case law, which the Defendant cited in its opening motion. Instead, Plaintiff cites only cases applying the exclusionary rule in the criminal context. *See* Pl. Br. 11, ECF No. 82 (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974); *Weeks v. United States*, 232 U.S. 383 (1914); *Nardone v. United States*, 308 U.S. 338, 341 (1939); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

Thus, the existence of probable cause can continue to defeat a § 1983 claim for damages for a wrongful search and seizure even if it was determined that an earlier constitutional violation tainted the evidence seized for purposes of a criminal prosecution. *See, e.g.*, *Torres v. City of Chicago*, No. 18 C 2603, 2021 WL 392703, at *10 (N.D. Ill. Feb. 4, 2021) ("[E]ven if the evidence providing probable cause was the fruit of a warrantless entry and search without Plaintiff's consent, probable cause still insulates Defendants from liability." (citing *Martin*, 934 F.3d at 598)). Here, the state criminal court's decision on the motion to suppress did not determine whether the search warrants were supported by probable cause. And, as argued by the Defendant in its opening brief, more than sufficient probable cause existed in Detective Olson's applications to support the September 13 and 19, 2017 search warrants to insulate St. John from liability in the instant § 1983 action.

Detective Olson's probable cause affidavits were detailed. The September 13, 2017 probable cause affidavit was based on the personal observations of ACO Kalinowski and other officers of the conditions in the facility and the dogs, Detective Olson's own review of photographs and observation of some of the animals surrendered by the Plaintiff on September 11, 2017, and Detective Olson's initial consultation with Dr. Strasser, all of which is detailed in

the Material Facts section of this Opinion. The September 19, 2017 probable cause affidavit was based on the same information as the first warrant as well as Detective Olson's observations during the execution of the first search warrant, Dr. Strasser's detailed findings from her examination of the animals removed from the business, and Dr. Strasser's professional opinion that the remaining dogs should be removed from the facility because their health was at extreme risk, all of which is also detailed in the Material Facts section of this Opinion. The Plaintiff does not contest the veracity of the facts related to the condition of his business, the condition of the animals in his care, the depictions of the condition of the animals in the photographs, or Dr. Strasser's expert medical opinion based on her evaluation of the animals.

The Plaintiff also does not argue that these facts are an insufficient basis for a finding of probable cause. The Plaintiff's primary dispute with Detective Olson's probable cause affidavits is the suggestion that the Plaintiff was involved in dog fighting. However, as set forth in the probable cause affidavits, Detective Olson was concerned not only with the possibility of dog fighting but also with the animal abuse and neglect that was occurring at the business. Again, probable cause for Detective Olson to believe that the dogs in the Plaintiff's care were being neglected was supported by the information he gathered from ACO Kalinowski, Officer Stamate, Lake County Detective Dvorscak, and Dr. Strasser as well as his own observations.

Thus, the September 13 and 19, 2017 search warrants, supported by probable cause as determined by a neutral judicial officer, were facially valid and presumed to be reasonable. As a result, the searches of the Plaintiff's business on September 13 and 20, 2017, and the resulting seizures of the dogs and other property were pursuant to facially valid search warrants. Even though the state criminal court found that the evidence from those searches must be excluded in the criminal case as fruit of the poisonous tree because the search warrants were based on

information learned during the illegal search on September 11, 2017, that exclusionary rule does not apply in this § 1983 claim for damages based on the officers' actions. The evidence obtained during the September 11, 2017 search can provide a basis for finding that probable cause supported the September 13 and 19, 2017 search warrants. Accordingly, the searches were reasonable under the Fourth Amendment.

### 2. *Collateral Estoppel*

The Plaintiff also invokes collateral estoppel to argue that the Defendant's motion is barred by the state criminal court's ruling on the motion to suppress. Indiana law of preclusion applies to determine the collateral estoppel effect of an Indiana state court ruling in a subsequent federal court case. *Best v. City of Portland*, 554 F.3d 698, 701 (7th Cir. 2009) (citing 28 U.S.C. § 1738; *In re Catt*, 368 F.3d 789, 790–91 (7th Cir. 2004)). Under Indiana law, "[i]ssue preclusion, or collateral estoppel, bars subsequent relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former lawsuit and that same fact or issue is presented in a subsequent suit." *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 704 (Ind. 2012) (citing *Hayworth v. Schilli Leasing, Inc.*, 669 N.E.2d 165, 167 (Ind. 1996)). Indiana collateral estoppel requires three elements: "(1) a final judgment on the merits in a court of competent jurisdiction; (2) identity of the issues; and (3) the party to be estopped was a party or the privity of a party in the prior action." *Id.* (citing *Small v. Centocor, Inc.*, 731 N.E.2d 22, 28 (Ind. Ct. App. 2000)).

The Plaintiff contends that the issue of whether the September 13 and 19, 2017 search warrants were "facially valid" has already been decided by the state criminal court. The Plaintiff is incorrect. The state criminal court did not determine the facial validity of the search warrants and, thus, did not determine whether there was sufficient probable cause for the warrants. The

state court's decision to suppress the evidence seized from the searches was based solely on the illegality of the earlier September 11, 2017 search, which the parties agreed provided the basis for the search warrants. Notably, the search warrants were not even entered into evidence in the state court proceeding. Because the issue of whether there was probable cause to issue the search warrants was not decided by the state court, the Plaintiff's invocation of collateral estoppel fails. Thus, the Court does not reach the remaining elements of the test, including Defendant Town of St. John's argument that it was not a party to the prior state criminal litigation.

3.   *Monell Liability*

Finally, a municipality like the Town of St. John can only be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Because there was no Fourth Amendment violation based on the September 13 and 17, 2019 search warrants, there can be no *Monell* liability on the part of St. John. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (recognizing that there can be no *Monell* liability in the absence of an underlying constitutional violation).

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendant's Motion for Summary Judgment [ECF No. 77]. The Court DIRECTS the Clerk of Court to enter judgment against Plaintiff Larry Brodanex and in favor of Defendant Town of St. John.

SO ORDERED on September 29, 2022.

    s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT